66976. COLUMBUS, GEORGIA v. SMITH et al.

POPE, Judge.

Appellees Leon and Cora Smith filed suit on June 1, 1981 against Columbus, Georgia; Alexander Contracting Co., Inc.; Lon Alexander, Jr.; McMath, Trussell & Turner Construction Co., Inc.; Calhoun Products Co., Inc., d/b/a Consolidated Pipe & Gravel Co.; and Camp Concrete Industries, Inc., seeking to recover for damage to their property caused by flooding. The complaint alleged that as intense development occurred in the Bull Creek drainage basin upstream from the Smiths' property, appellant Columbus, Georgia failed to put any limits on the increased amount of water which the defendant developers were allowed to run off into Bull Creek, and that in spite of their complaints about the periodic flooding and erosion of their property, appellant had failed to alleviate the problem. Prior to or during the course of the trial, the suit was dismissed or settled as to all defendants except appellant Columbus, Georgia.

After extensive discovery proceedings and consideration of numerous pretrial motions, the case was tried before a jury against Columbus, Georgia on the ground it had maintained and in large part created a continuing nuisance which damaged the Smiths' property by (1) allowing upstream development to proceed and accepting ownership of streets and drainage systems in those developments without restricting increased surface water runoff, resulting in higher water levels and more frequent flooding in the area of the Smiths' property; (2) filling in the flood plain immediately downstream from the Smiths' property on the Alexander property to a height of ten feet or more and allowing McMath, Trussell and Turner to eliminate the flood plain at its site, despite the existence of a flood plain ordinance,

thereby creating constrictions and obstructions causing flood waters to back up onto the Smiths' property; (3) aggravating the problem downstream of the Smiths' property by making upstream channel "improvements" intended to make the increased water flow downstream faster, except in the area of the Smiths' property which was the only area left "unprotected" in the entire Bull Creek drainage basin; (4) itself engaging in upstream development by clearing and filing parts of the flood plain to install an industrial park, eliminating the flood plain and "channelizing" the creek, thereby aggravating the downstream problem; and (5) diverting water by changing the course of a ditch near the Smiths' property which carried the increased runoff from the new upstream developments, thereby eroding the back of the Smiths' property and further aggravating the problem of water backing up on it.

The trial lasted four weeks. Appellees presented evidence that they had moved into their home in 1954 and that their lot was near Bull Creek but not bordered by it. Bull Creek was a deep stream then, suitable for fishing and swimming. Prior to 1975 there was no recurrent flooding problem, although the Smiths did have water in the house on one occasion in 1959. From 1975 until the trial in July 1982 the Smiths' property was flooded 13 times, each time washing away their and their neighbors' gardens. On April 1, 1981 sewer-laden water rose to 3-½ feet above floor level in their home. In 1978 Mrs. Smith began contacting appellant's officials for help, and in 1980 started keeping notes of these conversations. In 1980 there were 13 calls and appellant's officials came to the property several times to view the area, observing the filling of the flood plain taking place on Alexander's property. However, nothing was done.

Development of the upstream property was documented by appellant's own publications detailing building projects undertaken and completed after 1970 which were approved by appellant. Appellant's planning department issued a report entitled "Natural Systems of Columbus, Georgia" in which it was stated: "As more and more of Columbus is cleared of vegetation and organic matter which absorbs the water, and is replaced with impervious materials such as roofs and paving, the quantity of surface water generated is increased and the potential for damage greater. As the increase continues, corrective measures must be taken. Failure to recognize the flood plain as a natural, normal and essential part of the drainage system of the river basin has led to haphazard development, with a consequent increase in flood hazards and damages. Problems can be caused indirectly by resultant flood conditions such as seepage, sanitary sewer or septic tank system back-up, erosion, siltation and water pollution; or directly by inundation and the force of surging flood waters." Consultants hired to work with appellant on the project concluded that its

regulations "relating to flooding, drainage, and sediment control . . . are not uniformly and consistently applied and thus . . . the Department of Public Works is left to maintain an inadequate drainage system."

Appellant's city engineer testified that according to the 1975 Flood Plain Study, the Smiths' home was not in the 100-year flood plain of Bull Creek, but in the 1982 study it was, showing that the water levels expected from a 100-year frequency flood had risen substantially. The storm which caused such damage to the Smiths' property on April 1, 1981 was only a 10-year frequency flood and a 12-year frequency rainfall, yet the house was flooded to a depth that left mud in the kitchen sink. The house and essentially everything in it was ruined. The Smiths introduced proof that the cost to repair the house was $14,200 and that the reasonable value of damage to or destruction of personal property was $13,372.18. There was vivid testimony of the emotional stress and mental suffering caused by such a catastrophe. The Smiths sought $75,000 in compensatory damages from appellant and half of their expenses of litigation and attorney fees, $15,962.

While appellant contended that watershed lakes in the upstream area of the Bull Creek basin were intended to alleviate the surface water runoff, the "Bull Creek Watershed Assessment" stated that the "lack of flood plain zoning and the increased development taking place, particularly that adjacent to the flood plain areas, [was] negating the objectives of the program." Appellant also presented testimony of the amount of rainfall on and about April 1, 1981, asserting that this was abnormal based on calculations from measurements taken at the Columbus airport. However, appellant's expert also conceded that upstream development in the Bull Creek basin had been more than expected and caused increased runoff, thus leaving the Smiths "unprotected." Appellant further argued that the consolidated government of Columbus, Georgia was a "county," rather than a "city," but introduced no evidence in support of this position. The Smiths showed that they were residents and taxpayers of the city both before and after consolidation of the Columbus-Muscogee County governments. The jury returned a verdict in the amount sought by the Smiths, upon which final judgment was entered. Appellant brings this appeal, listing more than 70 enumerations of error.

1. Among these many alleged errors, appellant contends that the transcending issue is whether city or county law governs the case, and that the appeal must initially be addressed on this question. Appellant's argument is that because of the consolidation of city and county governments pursuant to the Columbus-Countywide Government Charter (Ga. L. 1971, Ex. Sess., p. 2007 et seq.), Columbus, Georgia ceased to exist as a city and Muscogee County was the proper

defendant. Of course, under Georgia law a city may be liable for general and special damages and expenses of litigation for the creation or maintenance of a nuisance; a county, however, is subject to liability only if the nuisance results in a taking or damage of private property for public use and recovery is considered as a substitution for the damages in a condemnation action. See, e.g., *City of Columbus v. Myszka*, 246 Ga. 571 (5,6) (272 SE2d 302) (1980); *Fulton County v. Baranan*, 240 Ga. 837 (1) (242 SE2d 617) (1978). See also *Nimmons v. City of LaGrange*, 94 Ga. App. 511, 515 (95 SE2d 314) (1956).

The appellant did not raise or support its "county law governs" argument until after the case was first set for trial and it had announced ready, but its motion for partial summary judgment on this question was considered by the trial court over objection and denied. The law and the evidence amply support this ruling. The governmental entity created by the legislature pursuant to the Columbus-Countywide Government Charter (Ga. L. 1971, p. 2007, supra) possesses the attributes, functions and powers of both city and county government, but the charter "studiously avoids" designating the new political entity as one or the other form. See *Troup County EMC v. Ga. Power Co.*, 229 Ga. 348 (6) (191 SE2d 33) (1972). However, the legislature did specify in § 8-202 of the charter that "[t]he tort liability of the consolidated government shall be that of a municipality, except in the case of that area of the territorial limits of the consolidated government located outside all urban service districts which shall follow the rules of tort liability applicable to counties." Ga. L. 1971, pp. 2007, 2103. (By amendment effective March 29, 1983 this provision was changed subsequent to trial of this case to make county liability solely applicable. See Ga. L. 1983, p. 4493.) It was unequivocally shown that the Smiths' property was and had always been inside the urban service districts. Further, the Smiths' cause of action in this case sounded in tort, for the negligent creation and/or maintenance of a nuisance. See generally *Southland Coffee Co. v. City of Macon*, 60 Ga. App. 253, 258 (3 SE2d 739) (1939). Thus, the trial court correctly ruled that the 1971 charter provision was controlling here, and Columbus, Georgia was subject to tort liability as a city.

The charter further declaims in § 8-203 that "[f]or purposes of all applicable laws, the consolidated government shall constitute a municipality and a county or both. If a law applicable to municipalities and the same or another law applicable to counties are in conflict, the Urban Services District shall be considered a municipality and the General Services District shall be considered a county." Ga. L. 1971, pp. 2007, 2103-04. Therefore, even if it was timely raised, appellant's assertion that the legal status of Columbus, Georgia as a municipality was eliminated by the legislative creation of the consolidated government is contrary to the charter itself, as well as its interpretation by

the Supreme Court in this regard. *Troup County EMC v. Ga. Power Co.*, supra.

2. Nor do we agree with appellant's protestation that even if "city" law is applied the trial court erred in denying its motions for summary judgment or directed verdict both as to compensatory damages and expenses of litigation. This theory is advanced upon several premises, the first being that there was no proof of diversion of surface waters by appellant from another drainage area into Bull Creek, as the mere approval of upstream subdivisions or development by appellant (or its predecessors) in the past would not make appellant liable for any increased runoff. This argument was previously advanced by appellant in *City of Columbus, Ga. v. Myszka*, supra at 572, in which it argued that the city " 'did nothing' rather than 'doing something' when it allowed the upstream and uphill development to proceed in such a fashion that the volume of water flowing through the stream and dry wash was increased as a result of increased rain water run-off." The Supreme Court rejected this assertion, holding that it was clear on the facts that appellant had approved construction projects which gave rise to a continuing nuisance resulting from increased rainwater runoff, for which it was liable. The facts in the instant case are so similar that *Myszka* is controlling as to this contention.

Appellant's second premise, that there was no proof here as there was in *Myszka* of diversion of surface waters from another drainage area into Bull Creek, is simply not supported by the record. Rather, while there is ample evidence that Bull Creek is an integral part of appellant's extensive drainage system, there was no competent proof submitted to substantiate its claim that Bull Creek is merely a "natural watercourse" for which it had no duty to abate natural, gravitational runoff. See *Rinzler v. Folsom*, 209 Ga. 549 (1) (74 SE2d 661) (1953). See generally *Anderson v. Columbus, Ga.*, 152 Ga. App. 772 (4) (264 SE2d 251) (1979). The court did in fact twice instruct the jury over objection that "Columbus, Georgia is not under a legal duty to maintain or improve a natural watercourse," but the charge requested by appellant that Bull Creek was a natural watercourse was not authorized by the evidence and would have been tantamount to direction of a verdict in appellant's favor.

Neither do we concur that the trial court erred in refusing to instruct the jury that appellant had no duty to abate a private nuisance, as such a charge was not warranted under either the law or the evidence. Even though the Bull Creek Watershed Project may have initially been planned by the federal government and sponsored by Muscogee County, it was the appellant which reviewed and granted permission for the subsequent construction and development that precipitated the damage due to the increased rainwater runoff. More-

over, appellant participated in and approved the filling of the flood plains downstream, in spite of its own ordinances prohibiting it, and diverted water upstream through its participation in the "stream channel improvements" and in rerouting the drainage ditch abutting the Smiths' property.

"A nuisance is anything that works hurt, inconvenience, or damage to another, and the fact that the act done may otherwise be lawful shall not keep it from being a nuisance. Code § 72-101 [OCGA § 41-1-1]. . . . Thus, where the act is lawful in itself, it becomes a nuisance only when conducted in an illegal manner to the hurt, inconvenience or damage of another. [Cits.]. . . . A municipal corporation, like any other individual or private corporation, may be liable for damages it causes to a third party from the operation or maintenance of a nuisance, irrespective of whether it is exercising a governmental or municipal function. [Cits.] While it is true that a municipal corporation is not liable for its acts of negligence in discharging a governmental function, yet a municipal corporation cannot, under the guise of performing a governmental function, create a nuisance dangerous to life or health. [Cits.] To be held liable for maintenance of a nuisance, the municipality must be chargeable with performing a continuous or regularly repetitious act, or creating a continuous or regularly repetitious condition, which causes the hurt, inconvenience or injury [Cits.]. . . . and, if the municipality did not perform an act creating the dangerous condition, . . . the failure of the municipality to rectify the dangerous condition must be in violation of a duty to act. [Cits.]" *Mayor &c. of Savannah v. Palmerio*, 242 Ga. 419, 425-27 (249 SE2d 224) (1978).

"In a surface-water invasion case, the continuing invasions amount to a continuing trespass which is the equivalent of a continuing nuisance." *Brand v. Montega Corp.*, 233 Ga. 32, 33 (209 SE2d 581) (1974). "If the city claims a right to use the drainage [system] then it is under a duty to maintain it so that the content and flow of surface waters [do] not overflow to the damage of the adjacent property owners. [Cit.]" *City of Atlanta v. Williams*, 218 Ga. 379, 380-81 (128 SE2d 41) (1962). Accord, *City Council of Augusta v. Thorp*, 103 Ga. App. 431 (1) (119 SE2d 595) (1961). "Accordingly, this case falls into the category of cases in which the municipality has chosen to act, that is, has chosen to approve construction projects, and has acted, that is, has approved construction projects, which have given rise to a nuisance resulting from increased rainwater run-off, for which the city is liable. [Cits.]" *City of Columbus, Ga. v. Myszka*, supra at 572.

The remainder of appellant's nuisance arguments concern objections which were either not raised or considered in the trial court, or not supported by any valid legal reasoning or authority, or are merely illogical in light of the patent evidence to the contrary. Whether or

not there was a nuisance was the ultimate question for the jury, and the fact that on only one occasion the flooding waters rose above the floor level of the Smiths' house is totally irrelevant to this issue; in the *Myszka* case there was never any flood water in Myszka's house, only in his yard and shed. In fact, while appellant treats its numerous theories here as unsettled law, actually all issues of continuing nuisance properly raised on appeal, including the Smiths' right to recover the damages awarded, were considered and resolved in the Smiths' favor in *Myszka*, supra. See also *Nimmons v. City of LaGrange*, supra.

3. Appellant has enumerated as additional errors every jury instruction requested by the Smiths given by the trial court, as well as the court's failure to charge each one appellant requested which was refused. Suffice it to say that we have reviewed these instructions and find that the charge as given was as good as could be expected with the multiplicity of requests and issues raised by the evidence. " 'The charge as a whole was correct, and the court did correctly charge the jury on the duties and legal relationships of the parties in this case governing the issues raised.' [Cit.]" *Royal v. Davis Hauling Co.*, 164 Ga. App. 409, 411 (297 SE2d 333) (1982). "In order for a refusal to charge to be error, the written requests therefor must be entirely correct and accurate, and must be adjusted to the pleadings, the law, and the evidence in the case. [Cit.]" *Gibbs v. First Fed. Savings &c. Assn.*, 161 Ga. App. 27 (1) (289 SE2d 1) (1982). "The charge as given by the trial court was complete and sufficient to guide the jury in the decision of the factual issues submitted by the evidence presented at trial and encompassed the issues covered by [appellant's] requested charges which were not given. So long as the trial court submits to the jury proper charges from the issues presented by the evidence the trial court is not required to do so in specific language requested by the parties. [Cit.]" *McDonald Chevrolet Olds v. Gailey*, 157 Ga. App. 515 (1) (277 SE2d 800) (1981).

We find no ground for reversal for any reason assigned.

*Judgment affirmed. Quillian, P. J., and Sognier, J., concur.*

DECIDED JANUARY 6, 1984 —
REHEARING DENIED MARCH 14, 1984 —

*Forrest L. Champion, Jr., Eugene H. Polleys, Jr.,* for appellant.
*James E. Butler, Jr.,* for appellees.